WILLIAM F. LEONARD, Respondent, v. JAY A. MELLISH WAREHOUSES, INC., Appellant.

First Department, May 7, 1957.

*George A. Garvey* of counsel (*Garvey & Conway,* attorneys), for appellant.

*Abraham M. Fisch* of counsel (*Hyman Mates* with him on the brief), for respondent.

*Per Curiam.* The site of the occurrence here involved is a concrete ramp extending from an upper floor of a structure on Pier 57, North River, to the pier level, about 250 feet in length, bounded on each side by a concrete wall, and about 30 to 35 feet in width, divided lengthwise by a double yellow line. The ramp inclines from west to east. The northerly lane provides ingress and the southerly lane egress. The end of the incline of the southerly lane is indicated by a double line. Attached to the side of the southerly wall, several feet above the concrete ramp and immediately over a catwalk adjacent to the wall, is a large sign reading " Full Stop ".

On May 5, 1955, plaintiff, a longshoreman, was operating an empty motor vehicle in the southerly lane of the ramp proceeding down to the pier level. The vehicle was a four-wheel gasoline driven conveyance, with forks in front, commonly known as a hi-lo, utilized to raise, lower and transport cargo to and from the pier. Plaintiff's version of the occurrence is that he was proceeding in low gear down the ramp when he first saw defendant's employee coming from the safety lane

about 12 or 15 feet in front of him proceeding on foot diagonally from plaintiff's right (northerly) in a westerly direction. "Q. Will you tell me where this man as you said jumped out, just tell us what he did, first of all? A. Well, when I seen him first he had came off the safety lane from — it seemed to be from behind the watchman's shanty, he sort of come off like with a skip, like he was on a trot, and he was heading for the car. Q. Wait a minute. You say he was heading for the car. What car are you referring to? A. Well, there was a car parked on beginning of the slope of the ramp, was parked in between the two lanes. Q. That car was on this center line that you have mentioned, astride the center line, but at the foot of the ramp, is that correct? A. Yes, sir."

Plaintiff first applied the brake without undue force at or just past the stop sign, skidded to the left, turned sharply to the right and then jammed his brake, again skidding, this time to the right. The hi-lo overturned pinning plaintiff underneath causing the injuries complained of. The hi-lo never came in contact with the defendant's employee.

Photographs taken after the occurrence show skid marks from at or about the stop sign to a point past the guard's booth just beyond the southerly wall.

The case was submitted to the jury on the theory that defendant's employee created an emergency requiring plaintiff to bring the hi-lo to a halt in order to avoid injury to defendant's employee thereby causing the hi-lo to overturn and the consequent injuries to the plaintiff. Plaintiff is an experienced hi-lo operator. He does not allege or rely on any defect in the vehicle. He was proceeding proximately to the southerly wall as evidenced by the skid marks, and, consequently, his view of pedestrian traffic from his right was obstructed by the southerly wall of the ramp. He omitted to bring his vehicle to a stop at or before the stop sign. "Q. You went past the full stop sign without stopping, didn't you? A. As I made my turn. Q. I am asking you, didn't you go past the full stop sign without stopping? A. Yes. Put it that way, as I made my turn I went past. Q. I am asking you very simply, were you not still going, moving without having stopped when you went past the full stop sign? A. Yes."

The plaintiff testified he knew the full stop sign was for the purpose of avoiding accidents. "Q. It is to avoid accidents, isn't it? A. I imagine it is, sir." Further, plaintiff went past the full stop sign without reducing his speed. "Q. You were going just as fast, past the full stop sign as you came down approaching it, were you not? A. About the same speed."

Plaintiff did not know whether his brakes would hold. "Q. You cannot tell us, however, how far the total distance was from the time you first, as you say, applied your brakes until you finally overturned, in the meantime having jammed or hit your brake, can you? A. No, sir." "Q. Mr. Mates just asked you whether you had any trouble with the brakes that morning before the accident. As a matter of fact, you hadn't used the brakes on that hi-lo that morning, had you? A. That is right. Q. You don't know what condition they were in? A. No."

Plaintiff first testified that he received no instructions with respect to the operation of the hi-lo on the downgrade of the ramp. Later, he testified that with a load on the hi-lo he was to stop at the full stop, and, if he had no load on the hi-lo, he was to continue with caution. "Q. Were there any instructions given with respect to that full stop sign which you say was about four or five feet from the bottom of the slope of the ramp? * * * A. The procedure was — instructions was when we come to the stop sign, if we have a load on to stop; if not, just continue with precaution. The Court: What? The Witness: Continue with precaution, in other words, just watch yourself as you are going through it."

Assuming, as we must, that the hi-lo in the exercise of reasonable care could not be brought to a stop within less than 12 or 15 feet, without capsizing, and that plaintiff's view to his right beyond that point was obstructed, on this record, the finding of plaintiff's freedom from contributory negligence, implicit in the verdict, is against the weight of the evidence. We are also of the opinion, on this record, the finding of defendant's negligence and the finding that it was causally related to the occurrence, implicit in the verdict, also are against the weight of the evidence. In view of the physical facts, plaintiff should have proceeded with caution and anticipated the requirement of measures to avoid striking a pedestrian crossing the ramp at the point where plaintiff's view was obscured by the guard's booth, where, so far as the record shows, it would appear defendant's employee rightfully crossed, in order to reach his car which was parked at the bottom of the ramp between the two lanes. The defendant's employee was proceeding to his motor vehicle which was parked at the point where he had been directed to park by Doherty, the gateman employed by plaintiff's employer. "Q. You had spoken to him when he brought the car to the foot of the ramp, is that right? A. I told him where to put the car, I didn't talk to him. We don't talk to everybody that comes. The Court: How did you

convey it to him, by sign language? The Witness: That's right. Put the car on the side, that's all. The Court: You didn't say a word to him? The Witness: No, sir. The Court: You just pointed where the car was to go? The Witness: Correct."

The finding of negligence, freedom from contributory negligence and causal connection, inherent in the jury's verdict, in light of the foregoing, is against the weight of the credible evidence. The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event.

RABIN, VALENTE and McNALLY, JJ., concur; BOTEIN, J. P., and FRANK, J., dissent and vote to affirm.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.